[No. H020036. Sixth Dist. Dec. 21, 2001.]

DE ANZA SANTA CRUZ MOBILE ESTATES HOMEOWNERS ASSOCIATION, Plaintiff and Respondent, v.
DE ANZA SANTA CRUZ MOBILE ESTATES et al., Defendants and Appellants.

## COUNSEL

Bien & Summers, Elliot L. Bien, Dorothy K. Gustafson; Law Offices of Frederik A. Jacobsen, Frederik A. Jacobsen; Law Firm of David Spangenberg & Associates and David Spangenberg for Defendants and Appellants.

Morgan, Franich, Fredkin & Marsh, Mark B. Fredkin, William Siamas; and Burl S. Polon for Plaintiff and Respondent.

## OPINION

**BAMATTRE-MANOUKIAN, Acting P. J.**—In this action by a mobile-home homeowners association against the owners of the mobilehome park, a jury awarded punitive damages in the amount of $6 million after the trial court instructed the jury that it was "an established fact" that defendants had violated Civil Code section 798.41,[1] causing actual damages of $36,401.85, which had already been paid. The trial court subsequently awarded plaintiff attorney's fees pursuant to Civil Code section 798.85,[2] in the amount of $700,000. On appeal defendants raise the following arguments:

1) The superior court's jurisdiction is preempted by the Public Utilities Commission;

---

[1]Civil Code section 798.41 is part of the Mobilehome Residency Law. (Stats. 1978, ch. 1031, § 1, p. 3178.) It provides, in pertinent part, that "the park management may elect to bill a homeowner separately for utility service fees and charges assessed by the utility for services provided to or for spaces in the park. Any separately billed utility fees and charges shall not be deemed to be included in the rent charged for those spaces under the rental agreement . . . provided that at the time of the initial separate billing of any utility fees and charges the rent . . . is simultaneously reduced by an amount equal to the fees and charges separately billed." We will refer to Civil Code section 798.41 from time to time simply as section 798.41.

[2]Civil Code section 798.85 provides: "In any action arising out of the provisions of this chapter the prevailing party shall be entitled to reasonable attorney's fees and costs . . . ."

2) Plaintiff is not entitled to punitive damages for a violation of section 798.41, because the statutory remedies contained in Civil Code section 798.86[3] are the exclusive remedies for violations of provisions of the Mobilehome Residency Law;

3) The punitive damages award impermissibly punished defendants for defending an arguable position on a complex legal issue, for pursuing authorized remedies in the courts and before other tribunals, and for their attorney's "hardball" litigation tactics;

4) The punitive damages award was excessive as a matter of law; and

5) The attorney fee award must be reversed, as plaintiff was not the prevailing party in an action arising from the provisions of the Mobilehome Residency Law, within the meaning of Civil Code section 798.85.

We reject defendants' claim that jurisdiction is preempted by the Public Utilities Commission. However, we agree with their second contention. We find that actual damages plus the statutory penalty provided in Civil Code section 798.86, plus costs and attorney's fees authorized by Civil Code section 798.85, were intended to be the exclusive remedies in a cause of action to enforce the provisions of the Mobilehome Residency Law. Punitive damages would be available upon a proper showing in a tort action, and a plaintiff may elect to recover either punitive damages on a tort cause of action or statutory penalties on a cause of action for violating the statute. However, a plaintiff proceeding only on a statutory violation is limited to the statutory remedies. Punitive damages must be based on tort liability. Here plaintiff alleged tort causes of action but did not pursue them at trial. The jury was not instructed on any tort causes of action. Rather the punitive damages judgment was based only on the directed verdict that defendants had violated section 798.41. Punitive damages are not available for a statutory violation where, as in this case, the statute specifically provides for a penalty. Therefore the punitive damages judgment in this case cannot stand and we shall reverse the judgment.

For guidance in the event of a retrial, we further find that punitive damages in a tort action cannot be based on evidence of defendants'

---

[3]Civil Code section 798.86 provided at the time of the events herein: "In the event a homeowner or former homeowner of a park is the prevailing party in a civil action against the management to enforce his or her rights under the provisions of this chapter, the homeowner, in addition to damages afforded by law, may, in the discretion of the court, be awarded an amount not to exceed five hundred dollars ($500) for each willful violation of those provisions by the management."

litigation conduct occurring subsequent to the underlying tort, and cannot be based on claims that defendants filed motions, appeals and other proceedings authorized by law.

Because of our disposition reversing the judgment, we also reverse the postjudgment order awarding attorney's fees.

BACKGROUND

De Anza Santa Cruz Mobile Estates is a mobilehome park located within the City of Santa Cruz. Plaintiff and respondent is De Anza Santa Cruz Mobile Estates Homeowners Association (the Association), an association of approximately 200 mobilehome owners who rent space at the park. Defendants and appellants are De Anza Santa Cruz Mobile Estates et al. (De Anza), and Manufactured Home Communities, Inc., et al. (MHC), two successive groups of owners of the park (collectively referred to as De Anza/MHC).

Prior to August of 1993, the park residents paid a fixed monthly rent to the park owners that included the cost of water provided to the rented spaces. Water was furnished to the park by the City of Santa Cruz Municipal Water Department (the Water Department), which billed the park owners. Regardless of individual usage, each mobilehome owner paid a pro rata share of the park's water bill as part of the monthly space rental.

In 1990, section 798.41 was added to the Civil Code statutes known as the Mobilehome Residency Law (Civ. Code, § 798 et seq., or hereafter sometimes MRL). Section 798.41 was intended to address the concerns of park owners who were experiencing rising costs of utilities but were unable to pass the costs along to their tenants in the rent without running afoul of local rent control ordinances. The statute thus provides a means for billing utilities separately from pure rent. However, in order to protect park residents from an overall increase in rent as a result of the separate billing, the statute further provides that a park owner who begins billing utilities separately must at the same time reduce the rent by an amount equal to the separate charges. Thereafter if utility costs go up, the resident absorbs the increase.

Section 798.41 provides that a park owner "may elect to bill a homeowner separately for utility service fees and charges assessed by the utility" and that such fees and charges "shall not be deemed to be included in the rent charged . . ." for purposes of local rent control ordinances. However, the owner who so elects must, "at the time of the initial separate billing," simultaneously reduce the base rent "by an amount equal to the fees and charges separately billed." (§ 798.41, subd. (a).)

In May of 1993, the park managers gave notice to all the residents at the park that De Anza was going to install a submetered water system, and that, beginning in August of 1993, the residents would be billed separately for their individual water use at prevailing rates "pursuant to Civil Code § 798.41." The letter further informed the residents that their base rent would be reduced accordingly, "as required by California Civil Code § 798.41(a)."

The separate meters were installed, and in August of 1993 the park owners began the separate billing for submetered water service. The rental notice sent to the residents for August of 1993 reflected that each resident's base monthly rent had been reduced by $6.30, the average monthly water charge per space over the preceding year. The separate water bill consisted of three components: the charge for the actual use of water at each space at the standard rate charged by the Water Department; a "ready-to-serve" charge of $7.80 for each space, which is what the Water Department would charge to furnish direct service to a separate residence; and a 7 percent "City Tax" on the entire bill. The separate billing amounted to over twice as much as the residents had been paying for water and thus over twice as much as the corresponding rent reduction. Because the park owners now collected more from the residents in water charges than they paid to the Water Department, the use of the separate billing resulted in additional income to the owners.

The park residents informed the managers in writing that they objected to the new charges, on the basis that the new charges were greater than the corresponding reduction in rent and were thus in violation of both Civil Code section 798.41 and also the local rent control ordinance, Santa Cruz Municipal Code section 22.01.060. The residents' claim reached Barry McCabe, president of De Anza Assets, a management company that managed 30 to 40 different properties in addition to the De Anza Santa Cruz park. McCabe responded by letter in October of 1993. He stated that he believed De Anza was acting "appropriately and within the law" in charging the same rates as the local utility would charge, as provided in Public Utilities Code section 2705.5. He further stated that De Anza had "every intention of operating fairly, reasonably and within applicable law" and that if De Anza had "inadvertently" violated any provision of law, it would make the necessary corrections.

In a subsequent exchange of letters, the representative of the Association, Herbert Rossman, informed McCabe that the residents believed De Anza's separate billing was a clear violation of section 798.41. Rossman stated that he hoped the parties could reach an amicable resolution but that the residents were prepared to seek legal redress. He reminded McCabe that section

798.86 of the Civil Code provided for an award of $500 for each willful violation of the provisions of the Mobilehome Residency Law. McCabe responded, stating that he "fail[ed] to see what we are doing that is unlawful." In his opinion, section 798.41 was not "designed to assure . . . an equality of costs" between what De Anza was billing and what it was paying for water. Rather, the law was intended to ensure only that the owners did not charge more than the resident would be charged by the local water company for direct service. McCabe informed Rossman that he respected the residents' right to submit the matter to a court and he said that De Anza would "be prepared to deal with it accordingly."

On November 23, 1993, the Association, represented by counsel, and Herbert Rossman in propria persona, filed an action in superior court, seeking an injunction and damages. They alleged that by adding monthly charges for water service in excess of the amount of the rent reduction and in excess of the actual cost of the service to De Anza, De Anza had in effect raised the rent and had thus violated both section 798.41 and local rent control ordinances. The Association and Rossman sought to enjoin De Anza from imposing and collecting the new charges, and they sought damages in the amount of a refund of excess charges and the statutory penalty of $500 for each willful violation pursuant to Civil Code section 798.86.

Two successive demurrers to the complaint were sustained in part on the basis that the Association and Rossman had not exhausted their administrative remedies by submitting the matter to the city planning department pursuant to the procedure provided in local rent control ordinances. Plaintiffs' amended complaints added tort causes of action. Their third amended complaint was filed on November 15, 1994. By this time, De Anza had sold the property to MHC and MHC was added as a defendant. In addition to the alleged violations of Civil Code section 798.41, plaintiffs included causes of action for intentional misrepresentation, negligent misrepresentation and concealment. They alleged that De Anza made false representations to the residents and concealed facts from them regarding the amounts charged on the water bills, and that De Anza induced the residents to pay the false charges, knowing they were improper. Plaintiffs sought compensatory damages and punitive damages in the amount of $10 million. Defendants again filed a demurrer to this complaint.

On January 17, 1995, the trial court sustained defendants' demurrer to the third amended complaint without leave to amend as to the plaintiff Rossman on the ground that Rossman, as well as other residents of the park who had opted to be governed by local rent control law, must first exhaust their

administrative remedies by requesting a hearing before the city planning department. Following the sustaining of the demurrer as to Rossman, De Anza/MHC sought attorney fees from Rossman. The court denied attorney fees, and De Anza/MHC appealed from that order, which we affirmed in appeal No. H014039.

The matter was heard by a city hearing officer on June 20, 1995. In his "Findings and Decision," the hearing officer found that the imposition of the "ready-to-serve" charge, and the City Tax, over and above amounts De Anza was actually charged by the Water Department, went beyond the scope and purpose of section 798.41 and "allow[ed] a windfall de facto rent increase to De Anza which circumvents the statute." He determined that the only charges authorized by section 798.41 were the cost of actual water usage, plus a pro rata share of the ready-to-serve charge paid by the park owners to the Water Department, plus tax on those amounts. All other charges, which the hearing officer found amounted to $7.38 per tenant per month, were "unauthorized and disallowed." The hearing officer ordered the park owners to refund all excess charges collected since August of 1993, immediately discontinue billing of the excess charges, and bill only for "actual and permitted amounts under Section 798.41 of the Civil Code in the manner provided." In addition, the hearing officer specifically rejected De Anza's arguments that the Public Utilities Commission had exclusive jurisdiction over utilities rates.

The park owners requested that the hearing officer reconsider his decision because, among other things, his calculation of the refund had failed to recognize that they paid for water at a higher rate than the rate the residents were charged under the new billing. Since the hearing officer determined that they could only pass through their actual costs of water to the submetered residents on a pro rata basis, the park owners argued that they must be allowed to charge the residents at the rate that they paid the Water Department. Otherwise, they would be paying more for water than they could collect from their submetered residents. The hearing officer denied the request for reconsideration.

On September 27, 1995, the park owners filed a petition for a writ of mandate in superior court, seeking to overturn the decision of the city's hearing officer for abuse of discretion. After briefing and a hearing, the court entered judgment denying the petition on July 26, 1996, finding that "there was no prejudicial abuse of discretion, and that the findings of the Hearing Officer are supported by substantial evidence in light of the entire record." De Anza/MHC appealed this judgment.

While the appeal was pending, De Anza/MHC petitioned this court for a stay of the administrative decision ordering that they make refunds to the tenants for amounts collected in violation of section 798.41. We denied the request for a stay on November 27, 1996. The January 1997 billings at the park reflected that the excess charges had been removed. The park owners then calculated and refunded the accumulated overcharges to the tenants in March of 1997.

*Appeals No. H015876 and No. H016191*

On appeal from the trial court's judgment denying the writ of mandate, we reviewed the city's decision under the relevant standards of review to determine whether the city had proceeded in excess of its jurisdiction and whether there was any prejudicial abuse of discretion. (Code Civ. Proc., § 1094.5, subd. (b).) We concluded that De Anza's separate billings, to the extent that they included new charges that were not tied to actual costs or to any increase in the rate charged by the local utility company, were unlawful under Civil Code section 798.41. The only allowable charges under the statute were the actual cost of the water, the resident's pro rata share of the park owners' ready-to-serve charge, and tax on those amounts. We therefore found that the hearing officer had correctly interpreted the law and we upheld the city's decision ordering excess charges to be refunded to the park residents. However, we found that the hearing officer's calculation of the refund at $7.38 per space per month failed to take into account the fact that the park owners were billed by the Water Department at a higher rate for water usage than they charged the residents in the separate billings. We found that this variance in rates must be taken into account in order to pass through actual costs in compliance with Civil Code section 798.41. We therefore reversed the judgment and directed that the trial court issue a writ ordering the city to modify its decision with respect to the amount of the refund owed by the park owners to the park residents.

Our opinion in case No. H015876 addressed two further issues raised by the park owners: first that sections 2705.5 and 739.5 of the Public Utilities Code took precedence over section 798.41 of the Civil Code and *required* that they charge each tenant the same amounts as if the tenant were receiving water directly from the local water company; and second that the city's hearing officer exceeded his jurisdiction by determining what the park owners could charge the residents for water, since rate setting is the exclusive province of the Public Utilities Commission (PUC). We rejected both of these arguments.

As to section 2705.5 of the Public Utilities Code, we found that so long as the park owners passed through their actual water costs to the park residents

pursuant to Civil Code section 798.41, this was entirely consistent with Public Utilities Code section 2705.5.[4] Section 2705.5 simply provided that park owners who provided submetered water at cost, rather than supplying water for a profit, were granted "nonutility" status and were exempt from PUC regulation. Only if a park charged *more* than the local utility's rates, and thus profited from reselling water, would it be considered a utility subject to PUC jurisdiction under section 2705.5. As to Public Utilities Code section 739.5, we found that this section governs gas and electricity submetering and does not control a case involving submetered water.

In regard to the park owners' argument that the city's hearing officer engaged in rate setting and thus exceeded his jurisdiction, we found that De Anza/MHC was not subject to the exclusive jurisdiction of the PUC because it was not a public utility. In addition it was specifically exempt from PUC regulation under section 2705.5 of the Public Utilities Code. Furthermore, the dispute in this case arose under section 798.41 of the Civil Code, and the city's decision was made pursuant to the provisions of the Mobilehome Residency Law and in conformance with local rent control ordinances. The hearing officer's determination as to whether De Anza's separate billing for water complied with section 798.41 and with local rent control ordinances was therefore within his jurisdiction. We observed, however, that the hearing officer "did not have the power or authority under section 798.41 to establish the rates De Anza could charge for water in the future, once the provisions of that section have been fully complied with."

Finally, we denied a motion by the Association to dismiss the park owners' appeal on the ground that the park owners had applied to the PUC in March of 1997 to charge increased rates. We found that a decision by the PUC on that application would not interfere with or negate our determination in the appeal for the reason that our decision was "limited to the questions whether the City's hearing officer correctly interpreted and applied Civil Code section 798.41 with regard to the park owner's separation of rent and utilities in its billing practices, and whether the hearing officer exceeded his jurisdiction. The question what rates the park owner may now charge in order to recoup costs of providing submetered water was not before the hearing officer and is not before this court."

---

[4]Public Utilities Code, section 2705.5, provides as follows: "Any person or corporation, . . . that maintains a mobilehome park or a multiple unit residential complex and provides, or will provide, water service to users through a submeter service system is not a public utility and is not subject to the jurisdiction, control, or regulation of the commission if each user of the submeter service system is charged at the rate which would be applicable if the user were receiving the water directly from the water corporation."

We reversed the judgment and directed that the trial court issue a writ of mandate ordering the city to modify its decision only with respect to the amount of the refund De Anza/MHC must pay to the park residents.

In appeal case No. H016191, which we considered together with case No. H015876, we found that the Association would be entitled to attorney's fees as the prevailing party under Civil Code section 798.85. However, because we reversed the judgment in the case-in-chief, we also reversed the trial court's postjudgment order awarding attorney's fees. We directed the trial court on remand to reconsider the issue of attorney's fees and to determine which party, if any, was the prevailing party for purposes of attorney's fees under Civil Code section 798.85.

Our opinion in case No. H015876 and case No. H016191 was filed March 20, 1998. De Anza/MHC's petition for rehearing in this court and petition for review in the Supreme Court were both denied.

*Appeals No. H019543 and No. H019402*

Following the filing of our opinion in case No. H015876 and case No. H016191, the matter was resubmitted to the city's hearing officer, who issued modified findings on April 16, 1998. He found that no further evidence was needed to recalculate the amount of the refund, as the park owners had made a calculation of the refund that was agreed to by the residents, and the refund had already been tendered and accepted in March of 1997. Accordingly, the hearing officer found that the park owners were deemed to have satisfied the refund requirement as previously ordered. The hearing officer further found that the Association was the prevailing party on the only contested issue, whether the park owners' separate billing complied with section 798.41.

Following the issuance of the remittiturs by this court in case No. H015876 and case No. H016191, the Association filed a motion for attorney's fees in superior court. De Anza and MHC opposed the motion and filed their own motion, contending that they were the prevailing parties. On September 11, 1998, the court issued orders readopting its previous judgment entered July 26, 1996. The court then determined that the Association was the prevailing party and was entitled to an award of attorney's fees pursuant to Civil Code section 798.85. The court awarded the Association attorney's fees in the amount of $101,000.

De Anza/MHC appealed from the attorney's fee award and from the readopted judgment of the court. However, in those appeals, which we

decided together in case Nos. H019543 and H019402, De Anza/MHC raised no claims regarding the merits of the judgment or the award of attorney's fees. Their only claim was that the PUC had exercised exclusive jurisdiction over the subject matter of this lawsuit and that the judgment and order for attorney's fees must therefore be vacated for lack of jurisdiction. The basis for this claim was an "Order Instituting Investigation" (OII) filed by the PUC on December 17, 1998, which announced the PUC's intent to investigate "rates, charges and practices of water and sewer utilities providing service to mobilehome parks and multiple unit residential complexes and the circumstances under which those rates and charges can be passed to the end user."

We rejected the park owners' claim. As we had previously held, the hearing officer's decision interpreting Civil Code section 798.41 and local rent control ordinances "[did] not purport to authorize rate setting or intrude into the regulatory sphere of the PUC." This holding was law of the case. The intervening OII, we found, did not have the effect of "altering controlling law in this case or depriving this court or the superior court of jurisdiction." Under Public Utilities Code section 2705.5, a mobilehome park operator who provides submetered water to park residents at actual costs is not a public utility and is thus not subject to regulatory policies of the PUC. Furthermore, the park residents were specifically authorized by the Legislature to maintain an action against the park owner to enforce compliance with the Mobilehome Residency Law, including Civil Code section 798.41. We found that this action "does not concern any issues of rate setting policies and procedures and defendants in our case are not regulated utilities. The issue in our case is not what rates may be charged but rather how existing rent and utilities charges may be separately billed pursuant to Civil Code section 798.41 without resulting in an overall increase in rent." We concluded therefore that the PUC investigation did not have the effect of preempting this action.

We affirmed the readopted judgment and the order awarding attorney's fees. Our opinion in case No. H019543 and case No. H019402 was filed July 5, 2000. During the pendency of those appeals, the underlying case between the Association and the park owners had proceeded to trial and had resulted in a jury verdict for punitive damages against the park owners in the amount of $6 million.

*The Jury Trial*

Our opinion in case No. H015876 in March of 1998 had upheld the decision of city's hearing officer finding that the park owners had violated

section 798.41 and local rent control ordinances. Although the billing practice had been discontinued in January of 1997, and the refund had been paid and accepted in March of 1997, the Association continued to pursue its lawsuit against De Anza and MHC. The fourth amended complaint alleged violations of section 798.41 and sought statutory penalties under Civil Code section 798.86 plus costs and attorney's fees under Civil Code section 798.85. It also alleged tort causes of action for intentional misrepresentation, negligent misrepresentation, and concealment, and sought punitive damages in connection with the intentional torts. The residents who had been dismissed in order to pursue their administrative remedies under local rent control ordinances were added back into the lawsuit in May of 1998. The case proceeded to trial in January of 1999.

At issue during trial was whether the Association was entitled to punitive damages on the basis that De Anza/MHC's conduct was oppressive, fraudulent, or malicious, within the meaning of Civil Code section 3294. However, the Association's tort causes of action were neither argued nor proven. The tort claims were not submitted to the jury and the jury was not instructed on them. At the conclusion of the seven-day trial the court instructed the jury as follows: "The Court, meaning me, has found in this case that the defendants violated Civil Code Section 798.41, the De Anza defendants have caused $11,202.50 and the MHC defendants have caused $25,199.35 in actual damages and/or injury. This is an established fact and I have so instructed you. [¶] While judgment will be entered on these points in favor of the plaintiff and, in fact, . . . defendants have previously returned these sums to [plaintiffs], you are required to determine this issue; that is, whether the plaintiffs have proven by clear and convincing evidence that they are entitled to punitive damages as against—as a result of the defendants' conduct. So that is your issue." The court then instructed the jury on the elements supporting punitive damages, namely that they had to find "by clear and convincing evidence that the defendants were guilty of oppression, fraud or malice . . . ." The jury then returned a special verdict assessing punitive damages against De Anza and MHC in the amount of $6 million, with De Anza being assessed $1.8 million and MHC $4.2 million.[5]

Judgment was entered on February 19, 1999. The judgment recited that the court had directed a verdict against defendants for actual damages in the amounts described above and that these amounts had been paid. Based on

---

[5]Actual damages represented the refunds for the entire period that the unlawful charges were imposed, from August of 1993 to January of 1997. MHC purchased the property from De Anza in August of 1994. Damages were thus assessed proportionately: $11,202.50 against De Anza and $25,199.35 against MHC. Punitive damages were assessed against the two sets of defendants in the same proportions.

the jury's verdict, the judgment ordered that the Association recover from De Anza/MHC the total of $6 million in punitive damages. De Anza and MHC filed motions for judgment notwithstanding the verdict, for a new trial and for a remittitur of the punitive damages award, and the Association filed a motion for attorney's fees under Civil Code section 798.85. In an amended order dated April 20, the court denied De Anza/MHC's motions and granted the Association's motion. The court awarded the Association $700,000 in attorney's fees, plus $19,551.52 in costs. The court also granted a motion by the Association for an award of interest on the compensatory damages. De Anza/MHC appealed from the judgment and postjudgment orders.

ISSUES

On appeal De Anza and MHC argue first that the judgment and postjudgment order awarding attorney's fees must be reversed because the PUC investigation initiated in December of 1998 preempted the superior court's jurisdiction. On the merits they argue that punitive damages were not available for a violation of Civil Code section 798.41, which was the only basis for liability at trial. They contend that the statutory penalty authorized in Civil Code section 798.86 was intended to provide the exclusive penalty for violations of the provisions of the Mobilehome Residency Law. De Anza and MHC next claim that the jury's punitive damages award rested on prohibited grounds because it penalized them for taking and vigorously pursuing an arguable position in a novel and complex area of law, and because evidence of so-called hardball tactics during the course of the litigation cannot support a claim that they were guilty of oppression, fraud or malice in the conduct which gave rise to the lawsuit. Next De Anza and MHC argue that if we find punitive damages were appropriate in this case, the punitive damages award here was grossly excessive as a matter of law and should either be reversed for a new trial or reduced by this court. Finally, they argue that the $700,000 attorney fee award must be reversed because issues relating to the violation of the MRL had already been decided before the trial commenced; thus the Association did not prevail in an "action arising out of the provisions [of the MRL]," within the meaning of Civil Code section 798.85.

*Preemption*

■ The question whether the PUC preempted jurisdiction in this case was decided in our opinion in case No. H019543, which we filed after the final briefing in the present appeal. We concluded in that opinion that the PUC's initiation of an investigation into rates, charges and practices of water

utilities providing service to mobilehome parks did not preempt state court jurisdiction in this case. The action before us, we explained, "was limited to the question whether the park owners had complied with Civil Code section 798.41 when they instituted separate billing for water and for rent." Neither De Anza nor MHC was a regulated utility; there was no violation of Public Utilities Code section 2705.5; and the action did not concern any issues of rate setting policies and procedures. Therefore there was no preemption. Our opinion was filed July 5, 2000, and review was denied October 26, 2000. That decision is law of the case. (*Clemente v. State of California* (1985) 40 Cal.3d 202, 211-212 [219 Cal.Rptr. 445, 707 P.2d 818].)

*Availability of Punitive Damages in an Action Based Solely on a Violation of the Mobilehome Residency Law*

De Anza and MHC argue that the punitive damages judgment cannot stand because it was based only on the cause of action for statutory violations and a plaintiff suing to enforce a provision of the Mobilehome Residency Law is limited to the damages expressly provided by the statute. In addition to actual damages, Civil Code section 798.86 authorizes a penalty of up to $500 for each "willful violation" of the provisions of the Mobilehome Residency Law. Civil Code section 798.85 further authorizes an award of attorney's fees and costs to the prevailing party.

The Association, on the other hand, contends that punitive damages are available in connection with a violation of the MRL by virtue of the general provisions of Civil Code section 3294. That section provides that "[i]n an action for breach of an obligation not arising from contract," where the plaintiff proves by clear and convincing evidence that the defendant has acted with "oppression, fraud, or malice," plaintiff may recover, in addition to actual damages, damages "for the sake of example and by way of punishing the defendant." De Anza/MHC's violations of section 798.41, the Association argues, amounted to oppressive, fraudulent, and malicious conduct within the meaning of Civil Code section 3294, and therefore warranted an award of punitive damages, notwithstanding the statutory penalty provided in Civil Code section 798.86.

We turn first to a threshold issue. The Association contends that De Anza/MHC did not raise the claim at trial that punitive damages are not available for a violation of the MRL, and thus cannot raise it for the first time on appeal. (*Cushman v. Cushman* (1960) 178 Cal.App.2d 492, 498 [3 Cal.Rptr. 24].) We agree that this claim was not squarely presented to the court at trial. However, we decide to reach the merits here for several

reasons. As this case went to trial, the Association's fourth amended complaint sought both statutory penalties for violations of the MRL and also punitive damages for the pleaded intentional tort causes of action. As we explain more fully below, although an award of both statutory penalties and punitive damages may be a prohibited double recovery if based on the same conduct, it is not improper to proceed on both theories of recovery and then make an election of remedies either at trial or after trial. (See *Clauson v. Superior Court* (1998) 67 Cal.App.4th 1253 [79 Cal.Rptr.2d 747]; *Marshall v. Brown* (1983) 141 Cal.App.3d 408, 419 [190 Cal.Rptr. 392]; *Troensegaard v. Silvercrest Industries, Inc.* (1985) 175 Cal.App.3d 218 [220 Cal.Rptr. 712].) Here we find nothing in the record showing that the Association made such an election. Pretrial discussions suggested that the fraud claims would be pursued. The Association's trial brief indicated both remedies would be sought. However, the jury was never asked to decide the tort claims and never received instructions on those claims. Rather the jury was instructed to decide whether punitive damages should be assessed based on the "established fact" that defendants had violated section 798.41.

De Anza and MHC did raise the argument at trial that the jury must first find actual damages before assessing punitive damages. And De Anza and MHC apparently submitted proposed instructions that would have required the jury to find liability on the intentional tort causes of action before assessing punitive damages.[6] On appeal De Anza and MHC argue that they were not required to raise an issue at trial when to do so would have assisted plaintiffs and thereby would have prejudiced their clients' case. (See *City of El Monte v. Superior Court* (1994) 29 Cal.App.4th 272, 277 [34 Cal.Rptr.2d 490] [defense counsel not required to advise the court of a deficiency in plaintiffs' case, and in fact "would have violated his obligation to his clients had he done so"]; see also *Burckhard v. Del Monte Corp.* (1996) 48 Cal.App.4th 1912, 1918-1919 [56 Cal.Rptr.2d 569].) Under all of the circumstances, particularly since the central issue before us involves the propriety of substantial penalties, and since the asserted error fundamentally affects the validity of the judgment, we find that De Anza and MHC made an arguable effort to raise their claim in the trial court. (See *Hale v. Morgan* (1978) 22 Cal.3d 388, 394 [149 Cal.Rptr. 375, 584 P.2d 512].)

The Association invokes the doctrine of invited error, contending that De Anza/MHC explicitly agreed at trial that punitive damages were available by submitting a proposed special verdict form authorizing the jury to make a finding of punitive damages. De Anza/MHC's proposed special verdict form

---

[6]De Anza and MHC contend they submitted such instructions at trial; however the instructions were not made a part of the record.

directed the jury to answer, among other questions, the question "Shall punitive damages be assessed against the defendants?" The colloquy accompanying this proposed special verdict form gives no indication that De Anza/MNC conceded the point that punitive damages were available for a statutory violation of the Mobilehome Residency Law. Rather, the record indicates that the purpose of the proposed verdict form was to renew the earlier contention that the jury first must determine actual damages in order to award punitive damages. ▆ The doctrine of invited error applies only "when a party by its own conduct induces the commission of error." (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 212 [285 Cal.Rptr. 99, 814 P.2d 1341]; *Burckhard v. Del Monte Corp., supra,* 48 Cal.App.4th at p. 1918.) It does not govern where a party proceeds in accordance with adverse rulings and " ' "endeavor[s] to make the best of a bad situation for which he [or she] was not responsible." ' " (*Mary M. v. City of Los Angeles, supra,* 54 Cal.3d at pp. 212-213.) ▆ We conclude De Anza/MHC did not invite any error.

Two further factors support our decision to consider the merits of this issue. First, as the Supreme Court stated in *Hale v. Morgan, supra,* 22 Cal.3d at page 394, "even if the issue had not been properly presented to the trial court, we may nonetheless examine the validity of the statute under which penalties herein have been assessed. We have held that a litigant may raise for the first time on appeal a pure question of law which is presented by undisputed facts." (See also *B & P Development Corp. v. City of Saratoga* (1986) 185 Cal.App.3d 949, 959 [230 Cal.Rptr. 192].) Further, the issue presented here involves an important question of continuing public interest. In *Resolution Trust Corp. v. Winslow* (1992) 9 Cal.App.4th 1799, 1810 [12 Cal.Rptr.2d 510], this court observed that appellate courts will consider matters raised for the first time on appeal where "the public interest or public policy is involved." Here, the issue whether Civil Code section 798.86 was intended to provide the exclusive penalty for a violation of the provisions of the Mobilehome Residency Law, thus precluding an award of punitive damages for a statutory violation, meets both of these criteria. (See also *Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 6 [74 Cal.Rptr.2d 248, 954 P.2d 511].) We therefore proceed to the merits.

▆ We start by setting forth in full the text of Civil Code section 798.86 as it read at the time of the conduct herein: "In the event a homeowner or former homeowner of a park is the prevailing party in a civil action against the management to enforce his or her rights under the provisions of this chapter, the homeowner, in addition to damages afforded by law, may, in the discretion of the court, be awarded an amount not to exceed five

hundred dollars ($500) for each willful violation of those provisions by the management." With only minor changes, this statute was taken from Civil Code former section 789.13, enacted in 1975, and it became part of the new Mobilehome Residency Law in 1978. (Stats. 1975, ch. 1092, § 6, p. 2661; Stats. 1978, ch. 1031, § 1, p. 3178; Stats. 1978, ch. 1033, § 22, p. 3191.)[7]

■ Under the rules of statutory construction, we bear in mind that our primary task is to determine the intent of the Legislature so as to effectuate the purpose of the law. (*Kane v. Hurley* (1994) 30 Cal.App.4th 859, 862 [35 Cal.Rptr.2d 809].) In determining legislative intent, we first look to the statutory language itself. (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386 [241 Cal.Rptr. 67, 743 P.2d 1323].) "The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible." (*Id.* at p. 1387.) Since the issue before us also involves the extent to which the statutory penalties provided in Civil Code section 798.86 overlap with the punitive damages provisions of Civil Code section 3294, we must read the two statutes together and construe them so as to give effect, when possible, to all the provisions thereof. (*Tripp v. Swoap* (1976) 17 Cal.3d 671, 679 [131 Cal.Rptr. 789, 552 P.2d 749], overruled on other grounds in *Frink v. Prod* (1982) 31 Cal.3d 166, 180 [181 Cal.Rptr. 893, 643 P.2d 476].) If the meaning of the statutory language is unclear, we turn to the Legislative history to determine intent, and we apply other traditional aids in statutory construction. (*Texas Commerce Bank v. Garamendi* (1992) 11 Cal.App.4th 460, 471, 474 [14 Cal.Rptr.2d 854].)

■ On its face Civil Code section 798.86 provides for a penalty, in the court's discretion, of $500 for each willful violation of the provisions of the Mobilehome Residency Law, "in addition to damages afforded by law." De Anza and MHC contend that the quoted phrase refers to actual, or compensatory, damages. They argue that because the Legislature expressly provided for a penalty in addition to actual damages, and made no mention of punitive damages, it must have intended the penalty for willful conduct to be the exclusive punitive remedy available for a statutory violation. On the other hand, the Association contends that "in addition to damages afforded by law" refers to all other types of damages, including punitive damages under Civil Code section 3294. Thus the Association argues that on its face the statute specifically allows for punitive damages as part of the additional "damages afforded by law."

---

[7]The statute as amended in 1997 increased the amount of the penalty to $2,000 and specifically provided that the penalty was available in a small claims action. (Stats. 1997, ch. 141, § 1.)

We find the statutory language is reasonably susceptible of either interpretation. Thus we turn to the legislative history and other interpretive aids. The legislative history of Civil Code section 798.86 supports De Anza/MHC's view that the Legislature understood the phrase "damages afforded by law" to mean actual damages rather than all other damages available at law. The original Legislative Counsel's Digest accompanying Senate Bill No. 701 described the proposed remedial statute as follows: "This bill . . . would entitle a tenant . . . who is the prevailing party to recover, in addition to his [or her] actual damages, $250 for each violation . . . ." (See Legis. Counsel's Dig., Sen. Bill No. 701 (1975-1976 Reg. Sess.) Apr. 2, 1975.) Throughout the history of the bill, the Legislative Counsel's Digest continued to describe the term "damages afforded by law" as "actual damages." (See Legis. Counsel's Dig., Sen. Bill No. 701 (1975-1976 Reg. Sess.), as amended May 1, 1975, May 8, 1975, May 15, 1975, Aug. 4, 1975, Aug. 19, 1975, Aug. 26, 1975; see also Legis. Counsel's Dig., Sen. Bill No. 701 (1975-1976 Reg. Sess.) approved Sept. 27, 1975.) In the Enrolled Bill Memorandum to the Governor, dated September 24, 1975, the same understanding of the term "damages afforded by law" as "actual damages" was reiterated.

In 1997, when Assembly Bill No. 591 increased the statutory amount of the penalty to $2,000, the legislative history indicates no change in the term "damages afforded by law." Indeed several documents in the legislative history of Assembly Bill No. 591 show the Legislature continued to understand this term to mean "actual damages." (See Assem. Com. on Judiciary, Analysis of Assem. Bill No. 591 (1997-1998 Reg. Sess.) May 14, 1997; Sen. Judiciary Com., Analysis of Assem. Bill No. 591 (1997-1998 Reg. Sess.) June 17, 1997; Sen. Rules Com., Off. of Sen. Floor Analyses, Rep. on Assem. Bill No. 591 Rep., June 25, 1997; Special Memorandum from Legis. Counsel's Dig., June 16, 1997.) We find no mention whatsoever of punitive damages in the legislative history of section 798.86, and no indication that the lawmakers contemplated that the phrase "damages afforded by law" would include punitive damages.

The history of the statute reflects the recognition by the Legislature that mobilehome owners are deserving of "unique protection" under the law. (Civ. Code, § 798.55, subd. (a); *Greening v. Johnson* (1997) 53 Cal.App.4th 1223, 1226 [62 Cal.Rptr.2d 214].) Many mobilehome owners have a limited or fixed income and cannot afford protracted litigation. Further, it was assumed that actual damages for violations of the Mobilehome Residency Law would generally be small. The statute endeavored to respond to these circumstances by authorizing the court in its discretion to award the mobilehome owner who is successful in pursuing a civil or small claims action

against park management up to $500 for each willful violation of the MRL. The term "willful" is generally understood to mean deliberate or intentional conduct. (*Hale v. Morgan, supra,* 22 Cal.3d at p. 396; *Patarak v. Williams* (2001) 91 Cal.App.4th 826, 829-830 [111 Cal.Rptr.2d 381].) By providing a monetary penalty not tied to actual damages, and a relatively simple means of making the showing justifying such a penalty, the Legislature had a dual purpose: to promote effective enforcement of the provisions of the MRL by low-income tenants, and to punish "willful" violators of the MRL.

While the purpose of Civil Code section 798.86 was at least in part punitive, a question still remains whether it was intended to provide the *exclusive* penalty available for violations of the statute, thus precluding an award of punitive damages upon an appropriate showing of oppression, fraud and malice under Civil Code section 3294. To answer this question we turn to additional rules and maxims of statutory construction, and then to case law discussing the purpose and effect of similar penalty statutes.

Another statute closely situated in the MRL, which provides for injunctive relief in certain cases, specifically states that the remedy provided for therein is "nonexclusive." (Civ. Code, § 798.88, subd. (g).) Thus one can infer that the Legislature, if it intends a stated remedy to be nonexclusive or cumulative, knows how to express such a concept, and its silence on the subject therefore indicates a contrary intent. Furthermore, the Legislature has specifically provided in other statutes in other California codes that punitive damages *are* available, and presumably it was capable of including similar express language in Civil Code section 798.86 if it so intended. (See Civ. Code, §§ 56.35, 1786.50; Health & Saf. Code, § 1285; Fin. Code, § 779, subd. (a).) A corollary rule is the oft-cited maxim that "[t]he expression of some things in a statute necessarily means the exclusion of other things not expressed."[8] (*Gikas v. Zolin* (1993) 6 Cal.4th 841, 852 [25 Cal.Rptr.2d 500, 863 P.2d 745], citing *Dyna-Med, Inc. v. Fair Employment & Housing Com., supra,* 43 Cal.3d at p. 1391, fn. 13.) Thus by setting forth a specific penalty provision in Civil Code section 798.86, it can be inferred that the Legislature intended to exclude all other penalties. Finally, it is a generally accepted rule of statutory construction that a general statute must bow to a more specific statute addressing the same subject. (See *Schmidt v. Superior Court* (1989) 48 Cal.3d 370, 383 [256 Cal.Rptr. 750, 769 P.2d 932] ["Under traditional principles of statutory interpretation, there can be no question but that the later enacted and more specific provisions of Civil Code section 798.76 relating to adults-only rules in mobilehome parks would prevail over the more general provisions of the Unruh Act."]; accord, *Miller v. Superior*

---

[8]*Expressio unius est exclusio alterius.*

*Court* (1999) 21 Cal.4th 883, 895 [89 Cal.Rptr.2d 834, 986 P.2d 170] [specific statute controls even if another, " ' "standing alone, would be broad enough to include the subject to which the more particular provision relates." ' "].)

These rules tend to support the interpretation that the Legislature intended the statutory penalty set forth in Civil Code section 798.86 to be the exclusive penalty in a suit to enforce the provisions of the MRL. Further, such an interpretation comports with due process. First, it gives the park owner fair notice of the penalty available for particular conduct. (See, e.g., *BMW of North America, Inc. v. Gore* (1996) 517 U.S. 559, 574 [116 S.Ct. 1589, 1598, 134 L.Ed.2d 809] ["Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him [or her] to punishment but also of the severity of the penalty that a State may impose."].) Second, it avoids the possibility of double penalties for the same conduct. (*Troensegaard v. Silvercrest Industries, Inc., supra,* 175 Cal.App.3d at p. 227 [" 'A defendant has a due process right to be protected against unlimited multiple punishment for the same act.' "].)

Case law discussing the remedies available under similar penalty statutes also supports an interpretation of Civil Code section 798.86 to preclude an award of punitive damages in a cause of action for a statutory violation. In general the rules developed from these cases are as follows. Where a statute creates new rights and obligations not previously existing in the common law, the express statutory remedy is deemed to be the exclusive remedy available for statutory violations, unless it is inadequate. (*Turnbull & Turnbull v. ARA Transportation, Inc.* (1990) 219 Cal.App.3d 811 [268 Cal.Rptr. 856], disapproved on another ground in *Rojo v. Kliger* (1990) 52 Cal.3d 65 [276 Cal.Rptr. 130, 801 P.2d 373]; *Strauss v. A. L. Randall Co.* (1983) 144 Cal.App.3d 514 [194 Cal.Rptr. 520]; *Palo Alto-Menlo Park Yellow Cab Co. v. Santa Clara Transit Dist.* (1976) 65 Cal.App.3d 121, 131 [135 Cal.Rptr. 192].) A plaintiff may plead and prove a common law tort based on the same conduct, and thus may recover punitive damages on a showing under Civil Code section 3294 that the tortious conduct was characterized by "oppression, fraud, or malice." (*Marshall v. Brown, supra,* 141 Cal.App.3d 408, 418; *Clauson v. Superior Court, supra,* 67 Cal.App.4th 1253.) However, a plaintiff cannot recover both punitive damages and statutory penalties, as this would constitute a prohibited double penalty for the same act. (*Troensegaard v. Silvercrest Industries, Inc., supra,* 175 Cal.App.3d at p. 227; *Baker v. Ramirez* (1987) 190 Cal.App.3d 1123, 1138 [235 Cal.Rptr. 857].) Thus a plaintiff must make an election between the two theories of recovery. (*Troensegaard*

*v. Silvercrest Industries, Inc., supra,* 175 Cal.App.3d at p. 227; *Clauson v. Superior Court, supra,* 67 Cal.App.4th 1253.) A plaintiff who relies solely on a cause of action for a statutory violation may be deemed to have waived punitive damages. (*Turnbull & Turnbull v. ARA Transportation, Inc., supra,* 219 Cal.App.3d at p. 827.) A closer look at the cases illustrates these principles.

In *Troensegaard v. Silvercrest Industries, Inc., supra,* 175 Cal.App.3d 218 (*Troensegaard*), the plaintiff brought suit against a mobilehome manufacturer for breach of warranty under a consumer protection statute (the Song-Beverly Act), and for products liability and fraudulent concealment. The Song-Beverly Act provided for a civil penalty of up to two times the amount of actual damages, plus costs and attorney's fees, where failure to comply with the statute was found to be "willful." (Civ. Code, § 1794, subd. (c).) The plaintiff sought compensatory damages, the statutory penalty and also punitive damages. A jury found in favor of the plaintiff and awarded $90,000 in compensatory damages, $55,000 in punitive damages, and $90,000 for the willful violation of the statute. The trial court then awarded the costs and attorney's fees authorized by the statute.

On appeal, the court in *Troensegaard* found that there was evidence to support the jury's finding of liability for intentional concealment and the requisite oppression, fraud, or malice to support an award of punitive damages. The court further found that the evidence supported a finding of willful conduct in order to justify the statutory penalty. However, the court found that awards of both the statutory penalties and punitive damages constituted double punishment for substantially the same conduct. Overlapping damage awards, the court found " 'violate that sense of "fundamental fairness" which lies at the heart of constitutional due process.' " (*Troensegaard, supra,* 175 Cal.App.3d at p. 227, quoting *In re No. Dist. of Cal. "Dalkon Shield" IUD Products* (N.D.Cal. 1981) 526 F.Supp. 887, 899, vacated on other grounds in *In re Northern Dist. of Cal., Dalkon Shield, etc.* (9th Cir. 1982) 693 F.2d 847.) Addressing the relationship between the statutory penalty provided in Civil Code section 1794 and the general punitive damages provisions in Civil Code section 3294, the court found that if the Legislature "had . . . intended a double recovery of punitive and penal damages for the same willful, oppressive, malicious, and oppressive [*sic*] acts, it would in some appropriate manner have said so." (*Troensegaard, supra,* 175 Cal.App.3d at p. 228.) The court concluded that by electing to receive the statutory penalty, which was in this case more than the punitive damages, the plaintiff had effectively waived punitive damages under Civil Code section 3294.

In *Turnbull & Turnbull v. ARA Transportation, Inc., supra,* 219 Cal.App.3d 811 (*Turnbull*), the plaintiff sued under the Unfair Practices Act for a violation of Business and Professions Code section 17043, but did not pursue any tort claims. The act provided for recovery of treble damages for violations of its provisions. (Bus. & Prof. Code, § 17082.) The plaintiff sought compensatory and punitive damages as well as treble damages under the statute. The trial court determined that the plaintiff was not entitled to both treble damages and punitive damages and would be permitted to make a postverdict election. The jury was not informed of the plaintiff's entitlement to treble damages under the statute and returned a verdict in favor of the plaintiff including an award of punitive damages more than three times the amount of the compensatory damages. The plaintiff then elected to receive that award instead of treble damages.

The Court of Appeal in *Turnbull* reversed the judgment and remanded for a new trial on damages. The court recognized that "[w]here a statutory penalty is imposed for a wrongful act, it does not preclude recovery of punitive damages *in a tort action* where the necessary malice or oppression is shown." (*Turnbull, supra,* 219 Cal.App.3d at p. 826, italics added, citing *Greenberg v. Western Turf Assn.* (1903) 140 Cal. 357, 363 [73 P. 1050].) If the statutory penalty and the punitive damages have the same purpose, however, "plaintiff cannot obtain a double recovery and must elect to have judgment entered in an amount which reflects either the statutory trebling or the compensatory and punitive damages." (*Turnbull, supra,* 219 Cal.App.3d at p. 826.)

The court in *Turnbull* drew a distinction between statutes providing a cause of action for violation of a recognized right and statutes that create a new right not recognized in the common law. As to the former, "all forms of relief granted to civil litigants generally, including appropriate punitive damages, are available unless a contrary legislative intent appears." (*Turnbull, supra,* 219 Cal.App.3d at p. 826; see also *Commodore Home Systems, Inc. v. Superior Court* (1982) 32 Cal.3d 211, 216 [185 Cal.Rptr. 270, 649 P.2d 912].) As to the latter group, the court said "when a new right, not existing at common law, is created by statute and a statutory remedy for the infringement thereof is provided, such remedy is exclusive of all others unless the statutory remedy is inadequate." (*Turnbull, supra,* 219 Cal.App.3d at pp. 826-827; accord, *Strauss v. A. L. Randall Co., supra,* 144 Cal.App.3d 514, 518; *Palo Alto-Menlo Park Yellow Cab Co. v. Santa Clara Transit Dist., supra,* 65 Cal.App.3d 121, 131.)

Applying these rules, the *Turnbull* court found that the rights created under the Unfair Practices Act were new rights not formerly existing at

common law. Consequently the statutory remedy was the exclusive remedy for a cause of action for violation of those rights. The court further found that the plaintiff in that case was not entitled to an election between statutory penalties and punitive damages because the plaintiff had relied solely on a statutory violation and had not pursued any common law tort cause of action. (*Turnbull, supra,* 219 Cal.App.3d at p. 827.) On this basis, the court in *Turnbull* distinguished the case of *Marshall v. Brown, supra,* 141 Cal.App.3d 408, where the plaintiff had alleged causes of action in tort, seeking compensatory and punitive damages, in addition to a civil action authorized by the Labor Code, seeking the statutory penalty of treble damages. Both theories relied on the same facts. In *Marshall* the court found that the plaintiff could make an election posttrial, after the jury had found in his favor on both theories.

A survey of cases from other jurisdictions indicates that the same general rules regarding the availability of statutory penalties and punitive damages apply in other states and in federal courts. A plaintiff may proceed on a cause of action for violation of a specific statute and a cause of action in tort based on the same conduct, and may recover either the penalties authorized by the statute or punitive damages on the tort claim, but not both. (See cases collected in Annot., Plaintiff's Rights to Punitive or Multiple Damages When Cause of Action Renders Both Available (1992) 2 A.L.R.5th 449.)

We have found no persuasive authority for the proposition that plaintiff is allowed to recover punitive damages based solely on a statutory violation where the statute expressly provides for a penalty that is punitive in nature. Respondent argues that *Greenberg v. Western Turf Assn., supra,* 140 Cal. 357 (*Greenberg*) is such a case. We believe *Greenberg* is distinguishable. In *Greenberg*, the court addressed the purpose and effect of a $100 penalty for refusing to admit a person to a racetrack. The penalty in *Greenberg* was more in the nature of a fine, to be imposed "in any and in every case" simply for a violation of the law without regard to defendant's motive or the effect on the plaintiff. (*Id.* at p. 364.) The Supreme Court found that punitive damages "for the personal indignity and wrong" suffered by plaintiff were awardable in addition to the statutory penalty as the punitive damages were for a different purpose. (*Ibid.*) *Greenberg* does not negate the general rule developed in recent cases that if the statutory penalties and punitive damages have the same purpose, to punish conduct that is willful or oppressive, plaintiff cannot obtain a double recovery. (See *Turnbull, supra,* 219 Cal.App.3d at p. 826, citing *Greenberg, supra,* 140 Cal. 357; *Marshall v. Brown, supra,* 141 Cal.App.3d at pp. 418-419, also citing *Greenberg, supra,* 140 Cal. 357.)

Based on the foregoing authorities and the rules of statutory construction discussed herein, we conclude that a plaintiff who proceeds solely on a cause

of action for violation of the provisions of the Mobilehome Residency Law is limited to the statutory penalty provided in Civil Code section 798.86. The MRL established a new and comprehensive set of rights and remedies for mobilehome residents. (*Schmidt v. Superior Court, supra,* 48 Cal.3d at pp. 378, 381.) No such specialized rights and remedies existed at common law. Therefore, under *Turnbull,* the remedy provided in the statute "is exclusive of all others unless the statutory remedy is inadequate." (*Turnbull, supra,* 219 Cal.App.3d at p. 827.)

As an example of an inadequate statutory remedy, the court in *Turnbull* cited *Orloff v. Los Angeles Turf Club* (1947) 30 Cal.2d 110 [180 P.2d 321, 171 A.L.R. 913]. In that case the plaintiff was refused admission to a racetrack and sued for injunctive relief under civil rights statutes that codified the law previously addressed in *Greenberg, supra,* 140 Cal. 357. The court found that even though the statute provided only for a monetary penalty of $100 and did not mention injunctive relief, injunctive relief was nonetheless available. The court explained that the $100 penalty was "a relatively insignificant recovery when we consider that a positive and un-equivocal right has been established and violated." (*Orloff,* at p. 114.) The court found that the inadequacy of the remedy provided by the statute was "manifest" and that there were no valid reasons why injunctive relief should not be provided. (*Ibid.*) Although *Orloff* cited *Greenberg* with approval, the court in *Orloff* did not address or discuss punitive damages. It cannot be said in our case that the remedy provided by the MRL was inadequate, as was the case in *Orloff.* Injunctive relief had already been provided here and the statute in addition authorized recovery of actual damages, a penalty for willful violations, and costs and attorney's fees. Indeed, the Association has asserted that the statutory penalties could provide it with an even greater recovery than the award of $6 million in punitive damages.[9]

We hold that since the only basis for liability in this case was the "established fact" that De Anza/MHC had violated section 798.41, the penalty provided in Civil Code section 798.86 was the exclusive penalty available, and the punitive damages judgment must therefore be reversed. We reject De Anza/MHC's further argument, however, that by not obtaining a judgment on its tort claims and failing to seek the statutory penalty for its cause of action under section 798.41, the Association is entitled to no recovery whatsoever. Such a result would not serve justice in this case, where the governing law was not clear and De Anza/MHC did not squarely present this claim of error in the trial court. On remand, therefore, the Association may seek punitive damages upon proving its tort claims and the

---

[9]The Association contends the statutory penalties could be "as high as $32.8 million."

requisite oppression, fraud, or malice under Civil Code section 3294, and/or may seek the statutory penalties in the court's discretion under Civil Code section 798.86, provided that the Association ultimately makes an election between the two remedies in order to avoid a double recovery.

Although our holding dispenses with the need to decide De Anza/MHC's further claims on appeal, we have concerns about the basis for the jury's punitive damages award here, and we will therefore discuss this claim in order to provide guidance in the event of a retrial.

*Legal Basis for the Punitive Damages Award*

The Association's theory of the case for punitive damages at trial was that De Anza/MHC acted with the requisite oppression, fraud, or malice, by collecting unlawful charges under the guise of separating rent and utilities, in order to circumvent rent control and generate income. Further, De Anza/MHC continued to impose and collect the improper charges for 41 months in blatant disregard of the law and the rights of the residents, even though De Anza/MHC knew or reasonably should have known that the charges were unlawful. The Association argued that during this litigation De Anza and MHC persisted in their unreasonable position that the charges were lawful under Civil Code section 798.41 and Public Utilities Code section 2705.5, and ignored or challenged rulings against them by the city hearing officer and by the court. And as further evidence of De Anza/MHC's malicious and oppressive conduct, they engaged during the litigation in unconscionable tactics of intimidation, harassment and delay in an effort to discourage the residents from pursuing their lawsuit so that De Anza/MHC could continue to take illegal profits.

De Anza and MHC claim that punitive damages cannot be imposed on the basis that they took a defensible legal position as to the purpose and effect of a new statute and that they acted in accordance with their interpretation of the law, even though their position was eventually rejected by the courts. They characterize this action as simply a legal dispute, and they argue that the question whether their interpretation of the statute was unreasonable is a matter for a court, not a jury, to decide. They claim they imposed the new charges in a good faith belief that the charges were lawful and were in fact required under Public Utilities Code section 2705.5, and that they were entitled to vigorously defend their position throughout the lawsuit. Punitive damages, they contend, cannot be predicated on such conduct.

We disagree with De Anza/MHC's view that this lawsuit involved only a legal dispute. We believe the jury could evaluate De Anza/MHC's conduct and the facts in this case to determine whether the elements of the tort claims

were established and whether De Anza/MHC acted with the requisite oppression, fraud or malice to support a punitive damages award. The question of a defendant's motivation and intent involves credibility determinations and other factual resolutions well within the province of the jury. However, we find that the evidence and argument in this case often strayed into areas improper for determination by a jury. A lay jury is not well suited to evaluate the relative merits of a legal position taken by a party. (*Coleman v. Gulf Ins. Group* (1986) 41 Cal.3d 782 [226 Cal.Rptr. 90, 718 P.2d 77, 62 A.L.R.4th 1083]; *Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 875 [254 Cal.Rptr. 336, 765 P.2d 498]; *In re Marriage of Flaherty* (1982) 31 Cal.3d 637 [183 Cal.Rptr. 508, 646 P.2d 179].) Furthermore, due process considerations are implicated to the extent that tort damages are based on evidence that a defendant filed motions, appeals and other legal proceedings during the course of litigation, or opposed motions filed by the other party. (See, e.g., *Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118 [270 Cal.Rptr. 1, 791 P.2d 587].) ■ Pursuing authorized forms of relief before courts or other governmental tribunals is a protected right and cannot be the basis for tort liability, except in a properly pleaded action for malicious prosecution. (*Ibid.*; *California Teachers Assn. v. State of California* (1999) 20 Cal.4th 327 [84 Cal.Rptr.2d 425, 975 P.2d 622].) And just as there is no tort of " 'malicious defense' " (*California Physicians' Service v. Superior Court* (1992) 9 Cal.App.4th 1321, 1325 [12 Cal.Rptr.2d 95]) arising from a defendant's conduct in defending a lawsuit, or "malicious filing of an appeal" (*Coleman v. Gulf Ins. Group, supra,* 41 Cal.3d at p. 793) for filing an appeal in bad faith, a defendant's trial tactics and litigation conduct may not be used to impose punitive damages in a tort action. (*Palmer v. Ted Stevens Honda, Inc.* (1987) 193 Cal.App.3d 530 [238 Cal.Rptr. 363]; accord, *California Physicians' Service v. Superior Court, supra,* 9 Cal.App.4th at p. 1325.)

■ A substantial portion of the Association's case at trial centered around accusations that the park owners continued to urge their position on the interpretation of Civil Code section 798.41 and Public Utilities Code section 2705.5 through the courts and before the PUC, conduct that counsel for the Association condemned in closing argument as "filing motions and doing appeals." Counsel exhorted the jurors to remember that De Anza and MHC were the ones who were "always appealing" and who, when they lost in the courts "ran over to the PUC." Considerable trial time was taken up with an examination of the merits of various demurrers and motions. During argument counsel for the Association stressed that De Anza/MHC "filed four demurrers" and that they "continued to ask for a stay" pending their appeal. And De Anza/MHC, it was suggested, would, if not stopped, "file more motions against these folks to seek more remedies."

■ "The right to petition for redress of grievances is a basic right guaranteed by the state and federal Constitutions [citations]." (*Pacific Gas & Electric Co. v. Bear Stearns & Co., supra,* 50 Cal.3d at p. 1133, fn. 15.) A person's right of access to judicial and quasi-judicial bodies to decide controversies is a fundamental component of our society that cannot be impaired by the threat of punishment or retaliation. (*California Teachers Assn. v. State of California, supra,* 20 Cal.4th at pp. 339, 356.) ■ The record in this case illustrates the problems inherent in permitting a lay jury to impute bad faith to legally proper, and not patently unreasonable, motions and appeals. For example, although the jurors were told that De Anza/ MHC's successive demurrers reflected their bad faith, the record shows that the demurrers were at least in part sustained, the last without leave to amend. Although De Anza and MHC filed a petition for a writ of mandate in superior court to review the hearing officer's decision against them, they were expressly authorized by statute to do so, and the parties agreed to a stay while the writ of mandate was pending. The fact that De Anza and MHC followed an authorized writ procedure, even though they did not prevail, cannot be used as evidence of malice to support a claim of punitive damages against them. Furthermore, in their subsequent appeal to this court (case No. H015876), although we upheld the hearing officer's decision that the charges for water were unlawful under section 798.41, De Anza/MHC obtained some relief in the form of a remand for a recalculation of the refund in a reduced amount. And we specifically found that they were not foreclosed from seeking relief in a different forum, before the PUC. Their filing of the appeal and their application to the PUC for the setting of an appropriate rate for utility charges are thus not legally relevant as evidence of bad faith.[10] Yet the jurors were repeatedly told that these attempts to seek judicial and quasi-judicial relief were part of De Anza/MHC's malicious and fraudulent course of conduct.

■ The question whether an appeal is completely without merit or is taken for an improper purpose is a legal issue for the court's de novo appraisal and has no place in a jury trial. (*Coleman v. Gulf Ins. Group, supra,* 41 Cal.3d 782, 791; *In re Marriage of Flaherty, supra,* 31 Cal.3d 637.) ■ "An appeal that is simply without merit is *not* by definition frivolous and should not incur sanctions." (*In re Marriage of Flaherty, supra,* 31 Cal.3d at p. 650.) It stands to reason that if an appeal is not frivolous under established legal standards, and would not subject the party to court-ordered sanctions, a jury cannot impose the sanction of punitive damages based on its assessment that the appeal was taken in bad faith. (See *Sheldon Appel Co.*

---

[10]At trial, De Anza/MHC sought to submit evidence that their application to the PUC for a higher rate was granted, but the trial court refused to admit this evidence.

*v. Albert & Oliker, supra,* 47 Cal.3d at p. 875 ["there is a significant danger that jurors may not sufficiently appreciate the distinction between a merely unsuccessful and a legally untenable claim"]; accord, *Coleman v. Gulf Ins. Group, supra,* 41 Cal.3d at p. 791.) As to De Anza/MHC's motions, requests for stays, or other proceedings filed in the trial court, that court may exercise its authority to sanction a party in a proper case upon the court's determination of bad faith. (*Palmer v. Ted Stevens Honda, Inc., supra,* 193 Cal.App.3d at p. 540; Code Civ. Proc., §§ 128.5, 2023.) Courts in this state have consistently held that this conduct is not a proper subject for tort remedies. (See *Cedars-Sinai Medical Center v. Superior Court, supra,* 18 Cal.4th at pp. 11-12.)

In addition to stressing that the De Anza/MHC defendants were "always appealing" or "go[ing] to another forum," the Association relied on evidence that De Anza/MHC employed "hardball" tactics designed to intimidate and discourage the Association from pursuing the lawsuit so that De Anza/MHC could continue to take illegal profits. Evidence was introduced that at an early hearing in this matter, David Spangenberg, the attorney for De Anza, confronted Rossman in the hallway of the courthouse and told Rossman he would "destroy" the homeowners association. Spangenberg warned Rossman and the attorney for the Association that they were "playing with fire" and he threatened to run up massive attorney's fees that they would have to pay. Spangenberg informed the Association's attorney several times, in strong language, that he was going to play "hardball" in this litigation. He predicted that the Association would be unable to withstand the pressure and that the residents, most of whom were retirees or elderly persons with fixed incomes, would be liable for large amounts of attorney's fees and would be at risk of losing their homes. Rossman and the Association's attorney, as well as other residents in the park, understood these statements as threats.

During argument, counsel for the Association summarized examples of De Anza/MHC's litigation tactics and argued that "there was hardball played as part of this tactic." He explained that in order to award punitive damages the jurors were to "look at the reprehensibility of the conduct" and that "[t]he strong-arm tactics that were used were reprehensible." Counsel spoke of the threats and intimidation by counsel for De Anza/MHC and told the jurors it was up to them "to determine if the standard is 'hardball' in this community."

In *Palmer v. Ted Stevens Honda, Inc., supra,* 193 Cal.App.3d 530 (*Palmer*), this court reversed a punitive damages award, holding that the trial court had committed reversible error in admitting evidence of defendant's litigation tactics "to prove bad faith, lack of probable cause, malice or oppression."

(*Id.* at p. 533.) This court found that even though defendant's bad faith was an element of the underlying tort, there was no precedent for the proposition that "the very manner in which a defendant conducts its defense in the litigation can be further evidence of bad faith." (*Id.* at p. 537; accord, *DuBarry Internat., Inc. v. Southwest Forest Industries, Inc.* (1991) 231 Cal.App.3d 552, 571, fn. 23 [282 Cal.Rptr. 181].)

This court further found in *Palmer* that "[o]ne significant defect in such evidence is that it holds the client responsible for the attorney's litigation strategy. While much of what an attorney does in litigation is contractually binding on the client [citation], where it is tortious the client is not vicariously liable merely for retaining the attorney who is an independent contractor. [Citations.] The client is insulated from tort liability for the attorney's litigation conduct on his [or her] behalf where '[t]here is no showing . . . of ratification or any other act by [the client] endorsing or approving the attorney's actions.' " (*Palmer, supra,* 193 Cal.App.3d at p. 539.)

"Another problem with the admission of such evidence is that it fails 'to consider or accord any weight to the right of a defendant to defend itself.' [Citation.]" (*Palmer, supra,* 193 Cal.App.3d at p. 540.) A defendant will be disabled from mounting a vigorous defense if litigation tactics are used as further evidence of bad faith. "Litigation," this court stated, "is governed by a different set of rules. It is for the law-and-motion judge and not the jury to assess whether a party should be penalized for bad faith discovery positions." (*Ibid.*)

We acknowledge the distinction made by the Association that the underlying bad faith conduct in this case allegedly continued during part of the litigation, until De Anza/MHC stopped imposing the unlawful charges and refunded the excess amounts in early 1997. Nonetheless we believe *Palmer* sets forth the generally accepted rule of law that the manner in which a defendant conducts its defense cannot be the basis for tort liability. By endorsing this rule, we do not by any means intend to condone the conduct that attorney Spangenberg termed the "hardball" tactics in this case. We do not believe, however, that the jury is in the best position to assess what is permissible zealous advocacy and what crosses the line, and thereby to impose the tort sanction of punitive damages based on a defendant's litigation conduct. Courts and the Legislature have developed sanction and disciplinary procedures to address such conduct. And established precedent in this state has consistently held that resorting to tort remedies is not the proper means to correct misconduct arising during litigation. (See, e.g., *Silberg v. Anderson* (1990) 50 Cal.3d 205 [266 Cal.Rptr. 638, 786 P.2d 365]; *Rubin v. Green* (1993) 4 Cal.4th 1187 [17 Cal.Rptr.2d 828, 847 P.2d 1044];

*Cedars-Sinai Medical Center v. Superior Court, supra,* 18 Cal.4th at pp. 11-12.)

As was the case in *Palmer,* plaintiff's closing argument in this case relied heavily on defendants' "reprehensible" and "strong-arm" conduct during the litigation in asking the jury for a substantial award of punitive damages. This court opined in *Palmer* that the improper evidence of defendant's litigation conduct so inflamed the jurors that it infected the entire trial and "undermine[d] the integrity of the punitive damage award." (*Palmer, supra,* 193 Cal.App.3d at p. 540.) The same can be said on this record, where the ratio between the actual damages and the punitive damages similarly suggests that "the award resulted from passion and prejudice." (*Ibid.*)

### Attorney's Fees

Because we reverse the judgment awarding punitive damages, the postjudgment order awarding attorney's fees must also be reversed. (*California Grocers Assn., Inc. v. Bank of America* (1994) 22 Cal.App.4th 205, 220 [27 Cal.Rptr.2d 396].)

### DISPOSITION

The judgment awarding punitive damages is reversed and the postjudgment order awarding attorney's fees is reversed. Based on the established fact that De Anza/MHC violated Civil Code section 798.41 of the Mobilehome Residency Law, on remand the Association may seek statutory penalties in the court's discretion under Civil Code section 798.86 and may also seek attorney's fees and costs under Civil Code section 798.85. The Association may also retry its tort claims and seek punitive damages based on tort liability. However, the Association may not recover both statutory penalties and punitive damages. The parties are to bear their own costs on appeal.

Wunderlich, J., and O'Farrell, J.,* concurred.

---

*Judge of the Monterey Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.