**Michael RUHE and Vicente Catala, Plaintiffs,**

v.

**MASIMO CORPORATION, Defendant.**

**Case No. SACV 11–00734–CJC(JCGx).**

United States District Court,
C.D. California,
Southern Division.

Signed April 3, 2014.

Scott Bonagofsky, Elizabeth R. Weiss, Bonagofsky and Weiss, San Francisco, CA, Kathryn Burkett Dickson, Dickson Geesman LLP, Oakland, CA, for Plaintiffs.

Jon R. Mower, Atkinson Andelson Loya Ruud and Romo, Joseph S. Cianfrani, Stephen C. Jensen, Payson LeMeilleur, Joseph R. Re, Benjamin J. Everton, Knobbe Martens Olson & Bear LLP, Irvine, CA, Mark T. Palin, Atkinson Andelson Loya Ruud & Romo, Cerritos, CA, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION TO VACATE FINAL ARBITRATION AWARD

CORMAC J. CARNEY, District Judge.

## I. INTRODUCTION

In September 2011, the Court ordered the parties to arbitrate Plaintiffs Michael Ruhe and Vicente Catala's claims that they were constructively discharged from Defendant Masimo Corporation because of undue pressure Masimo placed on them to sell its medical devices despite allegedly knowing that the devices were inaccurate and defective. Thirty-six hours before the final hearing in the arbitration, Masimo's counsel made a for-cause challenge to the continued service of the arbitrator, Retired Justice Richard C. Neal (the "Arbitrator") of Judicial Arbitration and Mediation Services ("JAMS"). The challenge was based on Masimo's recent discovery that the Arbitrator's brother had represented its chief competitor in two highly contentious litigation losses to Masimo with liability verdicts totaling over half a billion dollars. Instead of having the challenge heard by JAMS as required by JAMS's rules, the Arbitrator himself determined that he was not subject to disqualification and issued his final award, imposing $5 million in punitive damages against Masimo. This large punitive damage award, more than 16 times the compensatory damage award, was based in part on what the Arbitrator characterized as "abusive litigation tactics" by Masimo's counsel in the arbitration, including the fact that Masimo's counsel sought his disqualification. Masimo now moves to vacate the arbitration award. (Dkt. No. 49.) After considering the evidence presented by the parties and carefully reviewing the Arbitrator's written decision, the Court concludes that the arbitration award must be vacated. The Arbitrator demonstrated evident partiality by awarding excessive and improper punitive damages in retaliation for Masimo's counsel challenging his impartiality and taking other reasonable measures to zealously represent their client.[1]

---

1. In light of the Court's ruling, Plaintiffs' motion to confirm the arbitration award, (Dkt. Nos. 29–30), is DENIED.

## II. BACKGROUND

Masimo develops, manufactures, and sells non-invasive patient-monitoring medical devices. (Dkt. No. 51 ["Everton Decl."] Exh. 2 ["Final Award"] at 4–5.) Its first and leading category of products are devices known as pulse oximeters. Pulse oximeters, first introduced in the 1980s, measure oxygen saturation in the blood ("SpO$_2$") by analyzing wavelengths of light through a sensor clipped to the patient's finger. Previously, measuring blood oxygen required drawing a blood sample from the patient and sending it away to be analyzed in a laboratory. Early pulse oximeters were susceptible to inaccurate readings when the patient moved or had low blood flow. Masimo's founders invented advanced sensor technology that provided reliable readings under these conditions, and this technology became the basis for its pulse oximetry devices. Masimo's latest line of devices measure an additional blood constituent known as total hemoglobin ("SpHb"). The first of these devices, the Radical–7, was cleared by the Food and Drug Administration ("FDA") in May 2008. (Final Award at 8.) The devices primarily at issue in this action are the Pronto and Pronto–7 (together, the "Pronto Devices"), and were cleared by the FDA in October 2008 and June 2010, respectively. (*Id.*)

Plaintiffs were hired as sales representatives at Masimo in December 2008 and March 2009. (*Id.*) They were two of the sales representatives assigned to sell the new line of Pronto Devices. Plaintiffs experienced difficulty getting physicians and clinics to buy the new devices, which Plaintiffs attributed to problems with device accuracy. For instance, Mr. Ruhe did a product demonstration of the Pronto during a sales call with two doctors in January 2009, and the device displayed "significant variations in back to back readings among several doctors." (*Id.*) The doctors did not purchase the device. According to Plaintiffs, they reported to Masimo their difficulty selling the devices because of physicians' concerns about accuracy, but their complaints were met with "pressure and insistence that the [sales representatives] continue their efforts to sell the devices." (*Id.* at 13.) Plaintiffs' sales of the devices "had fallen off drastically" by mid–2010, and they were put on remedial performance plans. (*Id.* at 14.) In August 2010, Plaintiffs consulted an attorney, Mr. Bonagofsky, who would subsequently represent them in this action. (*Id.* at 19.) In October 2010, Plaintiffs downloaded thousands of Masimo documents and then resigned from the company. (*Id.* at 16–17.) Plaintiffs submitted their resignation letters on October 22, 2010. One week later, Plaintiffs filed their complaint against Masimo in the related action, *United States ex rel. Michael Ruhe, et al. v. Masimo Corporation,* Case No. SACV 10–08169–CJC(VBKx) (the *"Qui Tam* Action").

In the *Qui Tam* Action, Plaintiffs sought damages from Masimo under the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.,* asserting that Masimo made misrepresentations to the FDA and medical providers in connection with the Pronto Devices. Plaintiffs alleged, *inter alia,* that Masimo made misrepresentations regarding the devices' FDA-cleared indications for use, misrepresentations regarding validation studies, and misrepresentations regarding the devices' ability to perform to their FDA-cleared accuracy specification.[2] (*See Qui Tam* Action, Dkt. No. 52 at 14–15.)

---

**2.** The FDA granted clearance for Masimo to market the devices with an SpHb accuracy specification of +/− 1 gram per deciliter ("g/dL") at one standard deviation, which encompassed 68% of the population. (Final Award at 6.)

Seven months after filing the *Qui Tam* Action, Plaintiffs filed their complaint in this employment case.[3] Plaintiffs asserted claims for constructive discharge in violation of the whistleblower protections of the Dodd–Frank Wall Street Reform and Consumer Protection Act of 2010, 15 U.S.C. § 78u–6(h); retaliation in violation of California Labor Code section 1102(c); "wrongful constructive termination" in violation of public policy; and unfair competition in violation of California Business and Professions Code section 17200 *et seq.*[4] (Final Award at 25–29; Dkt. No. 1 ["Compl."].) The Court compelled the employment action to arbitration on September 16, 2011, 2011 WL 4442790. At some point in the proceeding, the arbitration apparently evolved into a plenary review of Masimo's medical devices and the minutiae of the company's compliance with FDA regulations. The parties were allowed to present evidence over ten days of hearings before the Arbitrator in early February 2013. Closing arguments were held in July 2013.

Meanwhile, the *Qui Tam* Action was proceeding in parallel. Pursuant to the scheduling order, trial was set for October 29, 2013, and all motions had to be heard by September 20, 2013. (*See Qui Tam* Action, Dkt. No. 52.) In light of the motion deadline, Masimo filed its motion for summary judgment on August 19, 2013, set for hearing on September 16, 2013. (*Qui Tam* Action, Dkt. No. 117.) The Court issued its order granting Masimo's motion for summary judgment on October 2, 2013. (*See Qui Tam* Action, Dkt. No.

255.) The Court found that Plaintiffs failed to demonstrate any knowingly misleading statements or conduct by Masimo in connection with the Pronto Devices. (*Id.* at 14–22.) Because the summary judgment order decided issues arguably identical to issues underpinning the employment arbitration, Masimo requested permission from the Arbitrator to brief the collateral estoppel effect of the order. The Arbitrator, who had already prepared "a substantial draft award [that was] near completion," (Final Award at 22), stated that he was "not happy about further delaying release" of the award, (Dkt. No. 58 ["Dickson Decl."], Exh. A). However, "[a]s there appeared to be overlap between the summary judgment order and the issues presented in the arbitration," the Arbitrator agreed that briefing was necessary. (Final Award at 2.) The briefing was completed October 21, 2013. (*Id.* at 20.) One week later, the Arbitrator issued an interim award finding in favor of Plaintiffs on their constructive termination claim and making the predicate finding for punitive damages. (Everton Decl., Exh. 1.) The Arbitrator directed the parties to submit briefing on the quantum of punitive damages and attorneys' fees, and set a hearing date of January 10, 2014. (Final Award at 2.)

On the evening of January 8, 2014, thirty-six hours before the final arbitration hearing, counsel for Masimo sent a letter to the Arbitrator challenging his continued service in the arbitration. (Everton Decl., Exh. 23 ["Challenge Letter"].) The letter

---

**3.** The *Qui Tam* Action was under seal pending the United States' decision to intervene. After the United States elected not to intervene in November 2011, the action went forward.

**4.** Masimo brought counterclaims in the arbitration against Plaintiffs for conversion and breach of contract. (*See* Everton Decl. Exh. 19.) Beginning months before they quit,

Plaintiffs allegedly stole "thousands of Masimo's confidential files, emails, and other confidential documents." (*Id.* at 1.) Plaintiffs had signed confidentiality agreements. (*Id.* at 8–9.) Despite the fact that the parties fully briefed Masimo's counterclaims, (*see id.*), the Arbitrator never ruled on them.

stated that in the past twenty-four hours Masimo had learned of information raising serious doubts about the Arbitrator's ability to be impartial toward Masimo. From 2004 to 2006, Masimo was embroiled in litigation with its chief competitor in the pulse oximetry market, Nellcor Puritan Bennett, Inc.[5] In 2004, after a six-week trial in Los Angeles, a jury found for Masimo on all of its patent infringement claims against Nellcor and awarded $164 million in damages.[6] *See Mallinckrodt, et al. v. Masimo Corp.,* Case No. CV 00–06506–MRP(AJWx). Then, in 2005, Masimo brought an antitrust action alleging that Nellcor engaged in anti-competitive conduct in the sale of its pulse oximetry devices. *See Masimo Corp. v. Tyco Healthcare Group, L.P., et al.,* Case No. CV 02–04770–MRP(AJWx). Following a four-week trial in Los Angeles, the jury found that Nellcor's conduct violated the antitrust laws and awarded Masimo $420 million in damages. This verdict was reported as 2005's fifth-largest jury verdict and the third largest in California. (Everton Decl., Exh. 24 at 28–32.) What Masimo's counsel discovered shortly before the final arbitration hearing was that the attorney who represented Nellcor during both actions, suffering two high-stakes, high-profile, back-to-back losses to its longtime rival, was Stephen C. Neal—the Arbitrator's brother. (Challenge Letter at 1.)

Rather than having JAMS decide Masimo's disqualification challenge, the Arbitrator denied the challenge the next day. (Everton Decl., Exh. 23.) The Arbitrator stated that he was not previously aware of his brother's representation of Masimo's

rival or the defeats his brother had suffered, that he violated no disclosure obligations, and that even if he had known of the information, it was not "sufficient to cause a person to reasonably doubt [his] ability to be impartial in this case" because "[n]o advantage could flow to [him] from disfavoring a company simply because [his] brother was [a] lawyer for a Masimo opponent." (*Id.*) The punitive damages hearing proceeded as scheduled on January 10, 2014.

Five days after the hearing, the Arbitrator issued the final award in the arbitration. The Arbitrator found that Plaintiffs had not shown Masimo retaliated against them in any regard, finding that "[t]here is no evidence that [Masimo's] insistence that the [sales representatives] keep selling was motivated by a desire to 'repay' Plaintiffs for complaining, or to punish or obtain revenge against them for protected activity." (Final Award at 28.) Accordingly, the Arbitrator found against Plaintiffs on their whistleblower retaliation claims under California Labor Code section 1102.5(c) and the Dodd–Frank Act. (*Id.*) With regard to the wrongful constructive termination claim, however, the Arbitrator found that Masimo "pressured [Plaintiffs] to sell and continue selling, and to tout the virtues of, medical devices which abundant experience and evidence showed were faulty and did not perform as claimed." (*Id.* at 25.) This "corporate environment," the Arbitrator concluded, "is no less intolerable for an honest, diligent employee, than one rife with racial prejudice or sexual harassment." (*Id.* at 26.) Consequently, the Arbitrator found

---

**5.** Nellcor's parent companies, Mallinckrodt, Inc. and Tyco Healthcare Group, L.P., were the named parties in these cases.

**6.** On appeal before the United States Court of Appeals for the Federal Circuit, the infringement verdict was affirmed in substantial part

and the circuit held that a permanent injunction should have been issued against Nellcor prohibiting it from marketing the infringing products. *See Mallinckrodt, Inc. v. Masimo Corp.,* 147 Fed.Appx. 158, 187 (Fed.Cir.2005).

in favor of Plaintiffs on their wrongful constructive termination claim and awarded them the full amount of economic damages they requested, $210,056, as well as $100,000 in general damages. (*Id.* at 29.)

Then the Arbitrator turned to the issue of punitive damages.[7] The Arbitrator found that Masimo "knowingly compelled" its sales force "to sell devices which they and [Masimo] knew to be unreliable," and that Masimo's sales force was harmed by this conduct. (*Id.* at 32.) The Arbitrator further found that "doctors and clinicians who were the subject of this campaign were harmed by being induced to purchase the devices [and] the patients whose treatments involved reliance on the devices were at risk of harm, and in at least one instance actually harmed." (*Id.*)

After this brief discussion of Masimo's conduct, the Arbitrator then detailed what he perceived to be "a series of questionable and abusive tactics" undertaken by Masimo's counsel in the arbitration. (*Id.*) The Arbitrator cited three main instances of supposed misconduct by Masimo's attorneys: first, requesting that the Arbitrator withdraw, which the Arbitrator called "unjustified factually or legally"; second, arguing for application of collateral estoppel based on the Court's summary judgment order in the *Qui Tam* Action; and third, making the argument, as characterized by the Arbitrator, that "U.S. Supreme Court authority bar[s] consideration of potential harm to others in determining reprehensibility for quantifying punitive damages." (*Id.* at 34.) The Arbitrator stated that Masimo's punitive damages brief, specifically its citation of *Philip Morris*, "outright misstated the law" on the critical issue of third-party harm. (*Id.* at 34, 37–38; *see also* Everton Decl., Exh. 15 ["Masimo Punitive Damages Br."] at 18–19 (citing *Philip Morris USA v. Williams*, 549 U.S. 346, 127 S.Ct. 1057, 166 L.Ed.2d 940 (2007); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 424, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003)).) The Arbitrator awarded punitive damages of $5 million— $2.5 million to each Plaintiff. (Final Award at 38.) He acknowledged that this was 16 times the total compensatory damages awarded, but reasoned that it was "in no sense disproportionate [because] it is only a fraction of [Masimo's] annual net income." (*Id.* at 39.)

## III. ANALYSIS

Section 10(a) of the Federal Arbitration Act ("FAA") provides the circumstances under which a federal district court may vacate an arbitration award.[8] An award may be vacated "where there was evident partiality or corruption in the arbitrator[ ]." 9 U.S.C. § 10(a)(2). Although the FAA was enacted to encourage

---

7. The Arbitrator agreed that due process and constitutional standards applied and stated that the award would conform to those standards. (Final Award at 35.)

8. Section 10(a) states, in its entirety:

In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

the expeditious resolution of disputes through arbitration, "it was [not] the purpose of Congress to authorize litigants to submit their cases and controversies [to arbitrators who] might reasonably be thought biased against one litigant and favorable to another." *Commonwealth Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145, 147, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968). Under the evident partiality standard, the party challenging the award has the burden "of proving facts which would establish a reasonable impression of partiality." *Sheet Metal Workers Int'l Ass'n Local Union No. 420 v. Kinney Air Conditioning Co.*, 756 F.2d 742, 746 (9th Cir. 1985); *see also Schmitz v. Zilveti*, 20 F.3d 1043, 1048 (9th Cir.1994). This showing requires "specific facts indicating improper motives" on the part of the arbitrator. *Toyota of Berkeley v. Auto. Salesman's Union, Local 1095*, 834 F.2d 751, 755 (9th Cir.1987); *see also Scandinavian Reinsurance Co. v. Saint Paul Fire & Marine Ins. Co.*, 668 F.3d 60, 72 (2d Cir.2012) (the evident partiality standard is met "when a reasonable person, considering all the circumstances, would *have* to conclude that an arbitrator was partial") (internal citation and quotation marks omitted).

■ The Arbitrator demonstrated evident partiality by deciding Masimo's disqualification challenge himself and then imposing punitive damages against Masimo in retaliation for the very fact that Masimo made the challenge. Rule 15(i) of the JAMS Employment Arbitration Rules & Procedures gives any party the right to make a for-cause challenge to the continued service of the arbitrator at any time during the arbitration. (Everton Decl.,

Exh. 27 ["JAMS Emp't Arbitration Rules"].) After a challenge is made, the opposing party has seven days to respond. Then "JAMS shall make the final determination as to such challenge." JAMS Emp't Arbitration Rules, Rule 15(i).

While Rule 15(i) is not controlling in this case, the fact that the Arbitrator disregarded the procedures set in place by his own organization and unilaterally determined that there was no cause for his disqualification is compelling evidence of his partiality. Rule 15(i) is not a mere formality. It reflects the wise policy that the final determination on challenges of bias should not be made by the presiding officer who is alleged to be biased.[9] The Arbitrator's ruling on Masimo's challenge was dismissive of the potential conflict, stating that it was merely based on the fact that his brother "represented companies adverse to Masimo in litigation." (Final Award at 2.) The circumstances in reality were much more serious. In the lucrative market for pulse oximetry medical devices, Masimo and Nellcor were Coke and Pepsi. The Arbitrator's brother, chairman of the firm Cooley LLP, represented Nellcor in two high-stakes, high-profile litigation losses to Masimo. Masimo was awarded over half a billion dollars in damages and won a permanent injunction under which Nellcor had to stop selling its current line of pulse oximeters and had to pay royalties to Masimo on the sale of its future devices. The integrity of the process required that the challenge be referred to JAMS for determination in accordance with JAMS's rules, under which the parties had agreed to arbitrate. Espe-

9. The American Arbitration Association ("AAA") has a substantively identical rule: "Upon objection of a party to the continued service of an arbitrator, or on its own initiative, the AAA shall determine whether the arbitrator should be disqualified [for grounds including partiality or lack of independence], which decision shall be conclusive." AAA, *Employment Arbitration Rules and Mediation Procedures*, Rule 16 (effective November 1, 2009).

cially in light of the stakes at issue—a $5.4 million award—a modest delay to obtain a ruling from JAMS would be no great burden on the parties or the Arbitrator. The Arbitrator's decision to decide Masimo's challenge himself, without even making additional disclosures or providing facts on the record to refute the alleged conflict, undermined the fairness of the proceeding and demonstrated his partiality. *See Pitta v. Hotel Ass'n of N.Y. City, Inc.*, 806 F.2d 419, 424 (2d Cir.1986) ("An even stronger risk of unfairness exists here where the arbitrator, acting alone, determines the validity of his own dismissal.").

 But this was not all the Arbitrator did. He used the very fact that Masimo's counsel made the challenge as a basis for imposing punitive damages against Masimo, further demonstrating evident partiality. (*See* Final Award at 34.) It is well settled in California that "a defendant's trial tactics and litigation conduct may not be used to impose punitive damages in a tort action." [10] *Bosack v. Soward*, 586 F.3d 1096, 1105 (9th Cir.2009) (quoting *De Anza Santa Cruz Mobile Estates Homeowners Ass'n v. De Anza Santa Cruz Mobile Estates*, 94 Cal.App.4th 890, 918, 114 Cal.Rptr.2d 708 (2001)). Punitive damages cannot be "based on evidence that a defendant filed motions, appeals and other legal proceedings during the course of litigation, or opposed motions filed by the other party." *De Anza*, 94 Cal.App.4th at 918, 114 Cal.Rptr.2d 708. Doing so would improperly impose liability on the client for the litigation tactics of its counsel. *See Palmer v. Ted Stevens Honda, Inc.*, 193 Cal. App.3d 530, 539, 238 Cal.Rptr. 363 (1987). It would also impair a defendant's right to vigorously defend charges brought against

it. *See De Anza*, 94 Cal.App.4th at 919, 114 Cal.Rptr.2d 708 ("A person's right of access to judicial and quasi-judicial bodies to decide controversies is a fundamental component of our society that cannot be impaired by the threat of punishment or retaliation."); *see generally Cal. Teachers Ass'n v. State*, 20 Cal.4th 327, 338–39, 84 Cal.Rptr.2d 425, 975 P.2d 622 (1999). Contrary to the Arbitrator's belief, Masimo's counsel had every right to challenge his impartiality. The Arbitrator's own brother had represented Masimo's long-time rival and suffered back-to-back losses to Masimo with over half a billion dollars in damages levied against his client. Masimo's counsel properly raised the challenge to the Arbitrator's impartiality, and the Arbitrator, in any event, never should have punished Masimo for making the challenge. The Arbitrator's handling of the issue demonstrates clear partiality on his part. *Cf. Toyota of Berkeley*, 834 F.2d at 757 (arbitrator's filing of sanctions against party's counsel supported a "serious allegation" of bias but did not establish evident partiality because he sought sanctions against the party's attorney rather than the party itself).

The Arbitrator further demonstrated partiality by punishing Masimo for its counsel arguing that the summary judgment order in the *Qui Tam* Action had collateral estoppel effect. (Final Award at 34.) The *Qui Tam* summary judgment order was a final judgment on the merits, in an action between the same parties. Any issues decided by the order potentially had preclusive effect in the arbitration. *See Aircraft Braking Sys. Corp. v. Local 856, Int'l Union, United Auto., Aerospace*

---

**10.** Although the Arbitrator clearly applied California law in deciding all other questions relating to punitive damages, he relied on a Third Circuit decision applying Pennsylvania law for the proposition that "abusive litiga-

tion tactics are properly considered in fixing the amount of punitive damages." (*See* Final Award at 32–33 (citing *CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc.*, 499 F.3d 184 (3d Cir.2007)).)

& Agr. Implement Workers, UAW, 97 F.3d 155, 159 (6th Cir.1996) ("[C]ircuits ... have held uniformly that arbitrators are bound by prior federal court decisions under the doctrine[ ] of collateral estoppel.") (collecting cases). One of the key findings of the order was that Masimo had not misled the FDA or medical providers with respect to the clearance, marketing, or sale of the Pronto Devices. (Qui Tam Action Dkt. No. 255 at 14–22.) This determination appeared to overlap with an issue central to Plaintiffs' constructive termination claim in the arbitration: whether Masimo "engaged in a long-running course of selling devices to doctors and clinics accompanied by performance claims, in particular the accuracy specification, which [Masimo] knew were false." (See Final Award at 27.) Indeed, the Arbitrator himself acknowledged that "certain determinations in the summary judgment order appeared to overlap with issues in the arbitration," and therefore "ordered the parties to brief the impact of the order on the arbitration." (Id. at 20.) In the Final Award, however, the Arbitrator used the very fact that Masimo argued for collateral estoppel as a reason to impose punitive damages on Masimo. (See id. at 34) ("[Masimo's] attempt to use the qui tam summary judgment to foreclose a decision on the merits in the arbitration also can be seen, in the context of the other conduct just discussed, to be abusive."). Masimo had every right to argue that the summary judgment order had collateral estoppel effect.[11] That the Arbitrator

characterized this conduct by Masimo's counsel as "abusive" and then imposed punitive damages on Masimo is further evidence of his partiality.

Finally, the Arbitrator demonstrated evident partiality by imposing punitive damages on Masimo for its counsel's argument distinguishing the Supreme Court's decision in Philip Morris. The Arbitrator characterized Masimo's brief as "outright misstat[ing]" Philip Morris's holding that "conduct that risks harm to others [may be considered] in determining reprehensibility." (Final Award at 34, 37–38 (quoting Philip Morris, 549 U.S. at 354, 127 S.Ct. 1057).) But the contrary is true. Masimo's brief expressly acknowledged Philip Morris's holding that "harm to nonparties may be considered in determining reprehensibility." (Masimo Punitive Damages Br. at 19 (citing Philip Morris, 549 U.S. at 354, 127 S.Ct. 1057).)

Nor did Masimo's brief "outright misstate[ ] the law" by then arguing that Philip Morris was distinguishable. Masimo argued that Philip Morris was distinguishable because in that case the conduct that harmed the plaintiff was identical to the conduct that harmed the relevant nonparties.[12] Masimo contended that potential harm to patients from the use of its devices was too dissimilar and tangential to the conduct that harmed the Plaintiffs— intolerable working conditions resulting in wrongful termination—to be a basis for imposing punitive damages. (See id. at 18–19.) Accordingly, Masimo argued that

---

**11.** The Court acknowledges that presiding over a lengthy arbitration only to be potentially precluded from issuing an award because of a judgment in a parallel proceeding would likely engender frustration. Even so, a final judgment in the Qui Tam Action came down while the arbitration was still pending. The Arbitrator was duty-bound to evaluate Masimo's collateral estoppel argument, and, in any event, to not punish Masimo for making the argument in the first instance.

**12.** In Philip Morris, the plaintiff was a smoker who died of lung cancer from cigarettes made by the tobacco company found to have lied about the dangers of smoking, and the nonparties were other smokers in the state who relied on the tobacco company's representations and suffered smoking-related diseases. 549 U.S. at 349–50, 127 S.Ct. 1057.

*State Farm* was the more relevant authority because it addressed the issue of whether *dissimilar* conduct could be used to justify punitive damages, finding that it could not. (*See id.*); *State Farm,* 538 U.S. at 422, 123 S.Ct. 1513 ("A defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages.").[13]

It is the attorney's right, even duty, to zealously advocate on behalf of his client. *See* Model Rules of Prof'l Conduct R. 1.3 cmt. (2013) ("A lawyer must [ ] act with ... zeal in advocacy upon the client's behalf."). The punitive damages brief submitted by Masimo's counsel did not cross the line of reasonably zealous advocacy, and it certainly did not "outright misstate[ ] the law."

## IV. CONCLUSION

Arbitration is intended to be a quick and efficient mechanism of dispute resolution, and it is a rare occasion when an arbitral award warrants setting aside. Unfortunately, this case is one of those rare occasions. By deciding Masimo's disqualification challenge himself, and then imposing punitive damages on Masimo for making the challenge and for other reasonable acts of advocacy by its attorneys, the Arbitrator demonstrated evident partiality that undermined the integrity of the award and the entire proceeding. The Arbitrator's award is VACATED.[14]

---

13. Masimo further argued that imposing punitive damages for dissimilar nonparty harm was especially inappropriate in this case given that the exhaustive evidence presented in the arbitration revealed only a single instance in which a patient was arguably harmed because of an inaccurate hemoglobin reading from a Masimo device. (*See* Masimo Punitive Damages Br. at 22–24; Final Award at 38.)

14. The parties shall appear before the Court for a status conference on April 29, 2014 at 9:00 a.m. to address further proceedings in this case.